FELIPE CEDEÑO ET AL., Plaintiffs and Appellees, *v.* TROPICAL CITY INDUSTRIES, INC., ET AL, Defendants and Appellants.

No. 10112. Argued May 12, 1950.—Decided June 23, 1950.

*Francis & Ydrach* for appellants. *Ramón G. Goyco* and *Rafael Hernández Matos* for appellees.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

Upon rendering judgment granting the complaint herein, the District Court of Ponce stated that, based on the credence it had given to the testimony of each witness and considering as a whole the probative force or value of the evidence introduced, it had made the following findings of facts:

"1. Felipe Cedeño and Silveria Rodríguez lived in concubinage in the Descalabrado Ward of Santa Isabel, both being single and of age. As a result of this union, the boy Confesor Cedeño Rodríguez was born in that Ward on March 4, 1933. After the child's birth, both continued to live there and several years later they separated, Silveria moving to Ponce. Here the boy was taken care of and visited by his father. He went to public schools and on February 1948 he was in the sixth grade.

"2. Early in the evening of February 8, 1948, Milton Leyro Luciano, acting as chauffeur of the codefendant Tropical City Industries Inc. (Puerto Rico) (which is and was engaged at that time in the making, sale and distribution of artificial ice in the District of Ponce), was conducting, operating and driving during the course and in the discharge of his duties as such chauffeur, on Insular Road No. 3, Ponce-Guayama, at a place called Cuatro Calles of Ponce, a Dodge truck, License H-2565, owned by the Tropical City Industries Inc. (Puerto Rico) which was utilized by the latter then and there to deliver ice, at an exaggerate and excessive speed, zigzagging, without sounding a claxon or blowing a horn, and when passing alongside the boy Confesor Cedeño Rodríguez, who was traveling in the opposite direction on that road, he did so in such a careless and negligent manner that he ran said Dodge vehicle against the body of the child, fracturing his skull, crushing his encephalic mass and killing him instantly.

"3. As a result of said accident the plaintiffs have suffered the loss of their son, the aid he could have given them in the future, mental anguish and sufferings, and damages which the court estimates as follows: As to the plaintiff Silveria Rodríguez, the parent with whom the child always lived, SIX THOUSAND DOLLARS ($6,000), and as to the father Felipe Cedeño, who, although, not always living with his son, often visited him, loving him and taking care of him according to his financial condition, THREE THOUSAND DOLLARS, which sums have not been paid to them.

"4. At the time of the accident, the truck which caused said death was insured against accidents and damages suffered by third parties with the codefendant Great American Indemnity Co., up to the sum of $10,000. (Stipulation of April 30, 1949)."

Feeling aggrieved by that judgment, the defendants took the present appeal. They contend that the lower court erred "in not permitting the defendants to introduce in evidence the result of an experiment made by Mr. Francisco Delgado, one of the officers of the Tropical City Industries, Inc., between eight and nine p.m., at the exact place of the accident, by which experiment they intended to prove to the lower court that under the circumstances prevailing at the time of the accident it was impossible for the witnesses of the plaintiffs,

who testified that they had identified the truck that killed Confesor Cedeño as truck license plate No. H-2565, to have seen it long enough in order to be able to make such identification. If such evidence had been introduced, the lower court would have been forced to conclude that the testimony of those witnesses deserved no credit. The refusal to receive that evidence was a clear abuse of discretion." That it also erred in granting Felipe Cedeño, the father of the dead minor, the sum of $3,000, since, because he had abandoned his child, he was not entitled to any compensation for the death of his son.

 The second assignment is frivolous. There was evidence believed by the court, to the effect that although the child's natural father did not live with the former's mother, he kept in touch with his son, visited him and gave him a weekly allowance—two or three dollars—for his expenses. Rule 17 (j) of the Rules of Civil Procedure [1] was not violated. It should be noted, however, that plaintiff's cause of action is not founded on Rule 17 (j) but rather on § 1802 of the Civil Code, 1930 ed. Méndez v. Serracante, 53 P.R.R. 807.

 The first error presents a question as yet undecided in this jurisdiction. It is the admission in evidence of the result of an experiment performed out of court and not in its presence. The general rule is that the admission of such

---

[1] Rule 17 (j) prescribes as follows:

"*Action for Injury or Death of Minor Child.*—A legitimate or acknowledged natural father, who has not abandoned his family, and the legitimate or natural mother, may individually or jointly maintain an action for the injury or death of a minor child, and a guardian for the injury or death of his ward, when such injury or death is caused by the wrongful act or neglect of another. Such action may be maintained against the person causing the injury or death, or if such person be employed by another person who is responsible for his conduct, also against such other person; provided, that the legitimate or natural mother shall always be a participant in the action to the same extent as the legitimate or acknowledged natural father; and provided, further, that nothing hereinbefore set forth shall be construed in violation of the rights of inheritance established by the Civil Code or the actions originating therefrom."

evidence falls within the discretion of the court and, furthermore, that in order that it be admissible it must be previously shown that the experiment was made under circumstances substantially alike or similar to those in the case at issue. This rule is applicable both to civil and criminal cases. 2 Wigmore on Evidence, 3d. ed., § 445, p. 432; 2 Jones on Evidence, 4th ed., § 410, p. 771; Underhill on Criminal Evidence, 4th ed., § 413, p. 838; 20 Am. Jur. § 755, p. 627; Annotations in 8 A.L.R. 18 and 85 A.L.R. 479; Experimental Evidence, 34 Ill. L. Rev. 206; *Martin* v. *Angel City Baseball Ass'n.*, 40 P. 2d 287 (Cal., 1935); *Amsbary* v. *Grays Harbor Ry. Light Co.*, 139 Pac. 46 (Wash., 1914).

Before the court may exercise its discretion in admitting or rejecting the evidence resulting from the experiment, it must nevertheless admit the evidence offered to prove that the experiment was performed under circumstances substantially alike or similar to those existing at the time the fact in question occurred. In *Amsbary* v. *Grays Harbor Ry. Light Co.*, *supra*, a situation similar to the one under consideration here arose, and the court, in reversing the judgment said:

"... The court was not yet called upon to rule upon the admissibility of evidence touching the result of the experiment, and it seems clear that the offer of proof touching the preliminary question of similarity of conditions was material and relevant to that question. We are of the opinion that the ruling of the court was clearly erroneous in so far as it included proof of the preliminary question of similarity of conditions...."

Of course, it is also discretionary with the courts to determine whether or not it has been shown that the similarity required in these cases existed. In the case at bar, however, the lower court apparently deemed that the evidence was altogether inadmissible. When the defendants were attempting to introduce evidence to the effect that the experiment had been performed under circumstances similar to those prevailing the night of the accident, a prolonged argument ensued at the end of which the court refused to admit the evi-

dence. We think that the lower court committed error, and were it not for the fact that certain other circumstances in the record show that the error was not prejudicial—*Ortiz* v. *Industrial Commission*, 51 P.R.R. 808; *Quiñones* v. *Galeno*, 53 P.R.R. 343; *Maldonado et al.* v. *Municipality of Ponce*, 39 P.R.R. 226; *Iparraguirre* v. *Nin*, 57 P.R.R. 744—the judgment should be reversed following the rule established in *Amsbary* v. *Grays Harbor Ry. Light Co.*, *supra*, and constantly approved in other jurisdictions as indicated by the above-cited cases and commentaries.

In his argument before the lower court, counsel for the appellants set forth his objective and indicated what he intended to prove with said experimental evidence, saying:

". . . Then, with Mr. Delgado we are going to show the court the distance between each entrance to said Salazar Ward and the entrance to the grade crossing, in view whereof the court will arrive at only one conclusion, *exclusively to challenge the testimony of the witness, this is our only purpose,* of plaintiff's witness Julio Rivera Rivera, whose testimony was heard by the Court right here, and who was the person who testified that while standing there at the entrance to the Salazar Ward he saw a truck coming and that said truck went by so fast that the witness said it was like this, I described it in the record like a snap of the fingers, and that witness testified that he not only saw the license plates, but that he read the names. The body of the truck read Tropical City Ice; that a person was riding in it. He testified as to how the deceased fell to the ground. I want to show the Court. I want to show to the Court that you cannot see all that in one second. He then testified that in that length of time, after saying that it was traveling at sixty miles, he saw all that. We will show by means of this witness that it is impossible, that it is physically, humanly impossible for a man to see all that in that time. This, to challenge the testimony of the witness Julio Rivera." (Italics ours.)

But the fact is that Julio Rivera Rivera was not the only witness to testify regarding the identification of the truck of the defendant Tropical City Industries, Inc. Witness José A. Rodríguez, who was accompanying the boy who was struck

down and killed during the accident, also identified it. He identified it at that time saying:

"Att'y Goyco: When you were then coming at that time, what happened?

"Witness: A truck was coming. It was coming...

"Att'y Goyco: From where was it coming?

"Witness: From Santa Isabel to Ponce, 'at full blast' and no horn was blown, and when it passed over the crossing it gave a jolt, *and I could see a small plate reading 'Milton'*. It came over zigzagging, and when it got to a curve, when it tried to turn around the curve, well, it swerved and Confesor pulled me, and thinking that he was saving himself, but he could not, and I fell into the gutter, and the truck hit him with the right side of the body, and Confesor fell into the gutter. Then they took him to the hospital and I went home, and the police, half an hour later, the police went to my house and we went to the cold-storage plant, my father and I."

And besides he again identified it after the accident when, together with his father, he was taken by two policemen precisely to look for and identify the truck, testifying in effect as follows:

"Att'y Goyco: Did the policeman go also?

"Witness: Yes, sir, to the cold-storage plant.

"Att'y Goyco: What happened when you arrived there?

"Witness: I looked around and I was told that all the trucks were in. And I searched and the small plate reading Milton was nowhere to be found, and we went to the Tropical and they asked the watchman whether the trucks were all in, and I searched carefully and I told him that Milton's was missing, the one with a plate with red letters, and I told him that that was the missing one.

"... . . . . . . .

"Att'y Goyco: Wasn't the truck there?

"Witness: No, sir. Then, the policeman, who seemed to know him . . .

"Att'y Goyco: Where did you go?

"Witness: To the Loma del Viento. Then he refused to come out, because he thought my father was the father of the one he had killed. Then the policeman felt the truck and it was hot, it was steaming hot.

"Att'y Goyco: What was the matter with him?

"Witness: That he refused to come out.

"Att'y Goyco: Will you describe that small plate?

"Witness: It had red letters.

"Att'y Goyco: What is this I'm showing you?

"Witness: The small plate!

"Att'y Goyco: Where was this plate located?

"Witness: On the right hand side of the bumper of the truck.

"Att'y Goyco: Are you sure this is the one?

"Witness: Yes, sir.

". . . . . . . .

"Att'y Goyco: How could you notice this plate?

"Witness: There is a street lamp nearby, a small cafe, and there is another on this side. I saw it when it jolted in the crossing.

"'Att'y Goyco: Is there a street lamp?

"Witness: Yes, sir.

"Att'y Goyco: Did you know Milton?

"Witness: No.

"Att'y Goyco: You say that there is a street lamp?

"Witness: Yes, sir.

"Att'y Goyco: And when the truck jolted in the crossing, did you notice the small plate?

"Witness: Yes, sir."

The two policemen who conducted this investigation corroborated Rodríguez's testimony in all its parts. There is still another interesting detail in the evidence. When the policemen were taking the chauffeur, Milton Leyro Luciano, to headquarters he told them that he had just arrived from Yauco. This notwithstanding, when Rodríguez, his father and the policemen arrived at his house, Milton Leyro asked José A. Rodríguez's father, Angel Rodríguez, a most significant question. We shall see. When they arrived at Milton Leyro's house the witness says that the following took place:

"Att'y Goyco: Do you say that you arrived at Milton's house?

"Witness: Yes, sir.

"Att'y Goyco: What did Milton say?

"Witness: He asked whether I was the father of the deceased.

"Att'y Goyco: And what did you answer him?

"Witness: He asked me twice, and the third time I told him that I was not the father."

If the chauffeur had just arrived from Yauco and was in his house, situated in the Loma del Viento of Ponce, a place other than Cuatro Calles where the accident occurred, how did he know of the accident and that a child had been killed in said accident?

We are convinced that, regardless of the testimony of the witness Julio Rivera, which was the testimony attempted to be challenged with the evidence of the experiment, the record contains sufficient evidence identifying the truck as well as the chauffeur of the defendant Tropical City Industries, Inc., and since said evidence was believed by the lower court, it is sufficient to support its finding that a vehicle belonging to said defendant, driven by its employee Milton Leyro, caused the boy's death.

The purpose of experimental evidence is none other than to aid the court to do justice, determining as exactly as possible the veracity of any situation of fact. Where such evidence might affect the veracity of the testimony of the only witness to the accident, as was the case in *Amsbary* v. *Grays Harbor Ry. Light Co.*, *supra*, the refusal to admit evidence upon the preliminary question of similarity of circumstances should bring about the reversal of the judgment as happened in that case. However, in a case like the one at bar the situation is different, since the experimental evidence offered to challenge a single witness could not have affected the remaining evidence to which we have referred.

The judgment will be affirmed.

Mr. Justice Snyder did not participate herein.